| | | |
|---|---|---|
| **KRISTEN MORALES** | * | **NO. 2022-CA-0216** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **OFFICE OF INSPECTOR** | * | |
| **GENERAL** | | **FOURTH CIRCUIT** |
| | * | |
| | | **STATE OF LOUISIANA** |

\* \* \* \* \* \* \*

APPEAL FROM
CITY CIVIL SERVICE COMMISSION ORLEANS
NO. 9234 C\W 9240
Honorable Jay Alan Ginsberg, Hearing Officer
\* \* \* \* \* \*
**Judge Rosemary Ledet**
\* \* \* \* \* \*

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge Rachael D. Johnson)

**LOBRANO, J., CONCURS IN THE RESULT**


Stephanie Dovalina
ATTORNEY AT LAW
700 Camp Street, Suite 105
New Orleans, LA 70130

      COUNSEL FOR PLAINTIFF/APPELLANT

Amy L. McIntire
Walter Francis Becker, Jr.
Peter Joseph Rotolo, III
CHAFFE McCALL, L.L.P.
1100 Poydras Street
2300 Energy Centre
New Orleans, LA 70163-2300

      COUNSEL FOR DEFENDANT/APPELLEE

                            **AFFIRMED**
                            **October 5, 2022**

This is a Civil Service Commission of the City of New Orleans ("the CSC") case. The Appointing Authority—the City of New Orleans Office of the Inspector General ("the OIG")—suspended and terminated the Appellant, Kristen Morales' employment as an investigator with the OIG. The CSC denied Ms. Morales' appeal of her suspension and termination, finding the OIG carried its burden of proving by a preponderance of evidence that it had good cause to suspend and terminate Ms. Morales and that such discipline was commensurate with the offense committed by Ms. Morales. From the CSC's decision, Ms. Morales appealed to this court. For the reasons that follow, we affirm the CSC's decision.

## FACTUAL AND PROCEDURAL BACKGROUND

The OIG's suspension and termination of Ms. Morales stems from an incident in late 2015 or early 2016, when Ms. Morales—an OIG investigator with permanent status as a classified employee—gave an OIG-owned iPhone to Reginald Fournier, a cafeteria worker in the OIG's building who was not employed

1

by the OIG.  In October 2020, Bobbie Jones, an OIG Information Technology ("IT") Security Specialist, reported to OIG Chief Investigator Michael Centola that Mr. Fournier and Darrel Turner, another cafeteria worker, had approached Ms. Jones on two separate occasions about a replacement charger for an iPhone Mr. Fournier had been given by Ms. Morales in late 2015 or early 2016.[1]  As part of her employment, Ms. Jones was responsible for maintaining an inventory of OIG IT equipment—including missing equipment—and suspected the iPhone might belong to the OIG.[2]  Ms. Jones and Mr. Centola reported the issue to Inspector General Ed Michel.[3]

Inspector General Michel assigned OIG investigator Terry Barret to contact Mr. Fournier and determine whether the iPhone in question was OIG property. Mr. Fournier reported that Ms. Morales had given him the iPhone years earlier and he gave the iPhone to Mr. Barret.  Mr. Barret and Mr. Centola confirmed from the iPhone's serial number that it was an OIG-owned iPhone that had gone missing years earlier.  Mr. Barret and Mr. Centola searched for documents evidencing approval for Ms. Morales to give the iPhone to Mr. Fournier but found nothing.

On December 1, 2020, after confirming the iPhone was OIG property, Mr. Centola and Mr. Barret interviewed Ms. Morales with another OIG employee

---

[1] Mr. Turner and Mr. Fournier denied that either of them approached Ms. Jones.  But, as discussed *infra*, it is undisputed that Ms. Morales gave Mr. Fournier the iPhone.  Thus, the issue of how Ms. Jones discovered the information is irrelevant.

[2] Before Ms. Jones began her employment with the OIG in 2017, Ms. Morales had been responsible for maintaining the OIG's inventory of IT equipment.

[3] At all times relevant to this appeal, Ed Michel was the interim Inspector General, prior to his official appointment as the Inspector General.  For brevity's sake we refer to him as simply Inspector General.

present as a witness. Initially, Ms. Morales admitted to giving Mr. Fournier an iPhone but could not recall whether it was the OIG's iPhone or her personal iPhone. Ms. Morales then claimed that she had received approval to give the iPhone to Mr. Fournier from Howard Schwartz, her former supervisor, or from former Inspector General Ed Quatrevaux. She believed their approval would have been documented in writing. Ms. Morales also claimed that Mr. Quatrevaux and Mr. Schwartz had approved a donation of OIG phones and computers to a church attended by Mr. Turner, seemingly suggesting the iPhone at issue was included in this donation to Mr. Turner's church. During the interview, Ms. Morales was given an opportunity to search her computer for documentation of approval to give away the iPhone but was unable to find any pertinent documents. Mr. Centola encouraged Ms. Morales to continue her search for documents evidencing approval following the conclusion of the interview, but she failed to produce any such documentation.

After the interview, Mr. Centola performed his own search for documentation of approval to give Mr. Fournier the iPhone, but his search yielded no results. OIG investigators also interviewed individuals referenced by Ms. Morales during her interview: Mr. Schwartz, Mr. Quatrevaux, and Mr. Turner. Mr. Schwartz did not recall authorizing Ms. Morales to give away any cell phones owned by the OIG but said that if he had given her approval, he would have documented it. Mr. Quatrevaux flatly denied ever authorizing Ms. Morales—or any OIG employee—to give away an OIG cell phone to a private individual,

3

characterizing such a donation as theft. Mr. Turner recalled a donation of several

OIG computers to his church in 2013, but he was certain the donation did not

include any cell phones.[4]

Following Ms. Morales' interview and the OIG's subsequent investigation,

Inspector General Michel concluded that Ms. Morales had given the OIG-owned

iPhone to Mr. Fournier without authorization and in violation of Policy

Memoranda Nos. 60(R), 83(R), and 109 of the City of New Orleans Chief

Administrative Office.[5] Mr. Michel also concluded that Ms. Morales had been

evasive and lacked candor during the investigation. Later, during his testimony

before the CSC, Mr. Michel explained that Ms. Morales' lack of candor was

particularly troubling, because, as an investigator, Ms. Morales was frequently

called upon to testify in criminal proceedings. Pursuant to the OIG's *Giglio*[6]

policy, prosecutors would be obligated to disclose Ms. Morales' lack of candor to

_____

[4] OIG employees found documents authorizing the donation of old OIG computers to Mr. Turner's church, but the donation did not include any phones and occurred more than two years before Mr. Fournier received the iPhone at issue.

[5] Policy Memorandum No. 60(R) is the Wireless Communications Device Policy applicable to all departments, boards, agencies, and commissions of the City of New Orleans and provides, in pertinent part: "the employee shall not loan or give the City provided device to any other person."

Policy Memorandum No. 83(R) establishes the standard of behavior for city employees and provides, in pertinent part: "City property shall be used only for the purpose for which it was intended."

Policy Memorandum No. 109 regulates assignment, usage and care, and return of city property by employees, and provides, in pertinent part: "An employee assigned the use of city property or equipment must maintain and not abuse or misabuse equipment while employed[.]"

[6] *See Giglio v. U.S.*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972).

opposing counsel, thereby undermining her credibility and the prosecution as a whole.

In a December 15, 2020 letter captioned "Notification of Emergency Suspension Notice of Pre-Termination Hearing," Inspector General Michel notified Ms. Morales that, based on her actions in giving away an iPhone owned by the OIG and her subsequent lack of candor when questioned about it, she was being placed on an emergency suspension; and a pre-termination hearing to show cause why she should not be terminated was scheduled for January 7, 2021.[7] The letter also notified Ms. Morales that she was permitted to have counsel present and to submit any documents she wanted the OIG to consider at the pre-termination hearing.

At the January 7, 2021 pre-termination hearing, Ms. Morales was represented by counsel and submitted documents in her defense relative to the five violations alleged by the OIG that were not related to her giving the OIG iPhone to Mr. Fournier. But, Ms. Morales offered no evidence of authorization to give away the OIG iPhone. On January 12, 2021, Mr. Michel sent Ms. Morales a notification of termination letter. The letter repeated the multiple alleged policy violations underlying the OIG's disciplinary actions, notified Ms. Morales of her termination due to the policy violations, effective January 7, 2021, and notified Ms. Morales of her right to appeal her termination to the CSC.

---

[7] The December 15, 2020 letter detailed five additional policy violations underlying the OIG's disciplinary action. But, at the CSC hearing, Inspector General Michel testified that the primary reason for Ms. Morales' termination was her unauthorized donation of the OIG iPhone and her lack of candor in the subsequent investigation regarding the iPhone. The CSC found that either the OIG failed to prove the five additional violations occurred or found that they did not warrant disciplinary action. Therefore the CSC denied Ms. Morales' appeal based solely on its finding that the OIG had good cause to terminate Ms. Morales for the iPhone-related violation. Accordingly, we do not address the OIG's allegations or investigation concerning the five alleged violations unrelated to the iPhone.

Ms. Morales appealed her suspension and termination to the CSC. Following a three-day hearing, the CSC Hearing Examiner issued a detailed report recommending Ms. Morales' appeal be denied. The Hearing Examiner found that the OIG established that Ms. Morales gave away the iPhone without authorization and lacked candor when questioned about the unauthorized action. Reasoning that "complete candor is an essential requirement of [Ms. Morales'] position," the Hearing Examiner concluded that the OIG did not abuse its discretion in terminating Ms. Morales. The CSC adopted the Hearing Examiner's report as its own and denied Ms. Morales' appeal. From the CSC's decision, Ms. Morales appealed to this court.

## LEGAL PRINCIPLES AND STANDARD OF REVIEW

The Louisiana Constitution provides that "[n]o person who has gained permanent status in the classified state or city service shall be subjected to disciplinary action except for cause expressed in writing." LA. CONST., ART. X, § 8(A). "An employee subjected to disciplinary action by his or her appointing authority has the right to appeal to the [CSC]." *Hardy v. Juvenile Justice Intervention Ctr.*, 21-0715, p. 3 (La. App. 4 Cir. 6/15/22), 342 So.3d 1076, 1079.

When such a classified employee appeals a disciplinary action to the CSC, the following principles apply:

- The CSC is required "to decide independently from the facts presented whether the appointing authority has a good or lawful cause for taking disciplinary action and, if so, whether punishment is commensurate with the dereliction." *Whitaker v. New Orleans Police Dep't.*, 03-0512, p. 2 (La. App 4 Cir. 9/17/03), 863 So.2d 572, 574 (citation omitted).

- The appointing authority has the burden of proof as to the facts. LA. CONST., ART X, § 8(A).

- "The appointing authority must prove by a preponderance of the evidence the occurrence of the complained of activity and prove that the conduct

6

complained of impaired the efficiency of the public service and that it bears a real and substantial relationship to the efficient operation of the public service." *Cittadino v. Dep't of Police*, 558 So.2d 1311, 1315 (La. App. 4th Cir. 1990) (citation omitted).

- The legal basis for the CSC making any change in the appointing authority's disciplinary action is limited to the appointing authority's failure to establish sufficient cause for its disciplinary action. *Branighan v. Dep't of Police*, 362 So.2d 1221, 1222 (La. App. 4th Cir. 1978).

- In this context, the term cause has two components—(i) the occurrence of the complained-of conduct; and (ii) an impairment of public service in which the appointing authority is engaged. *Newkirk v. Sewerage & Water Bd. City of New Orleans*, 485 So.2d 626, 628 (La. App. 4th Cir. 1986) (separately addressing cause and impairment elements); *Gast v. Dep't of Police*, 13-0781, pp. 3-4 (La. App 4 Cir. 3/13/14), 137 So.3d 731, 733.

- The CSC, thus, must first determine if the appointing authority has met its initial burden—established the occurrence of the complained-of conduct and the impairment. If that initial burden is met, then the CSC must determine if the discipline imposed is commensurate with the misconduct. *Abbott v. New Orleans Police Dep't*, 14-0993, p. 7 (La. App. 4 Cir. 2/11/15), 165 So.3d 191, 197.

Simplified, before the CSC, the appointing authority has the burden of proving three elements—(1) the occurrence of the complained-of conduct— misconduct; (2) the impairment, as a result of the misconduct, of the department's efficiency—impairment; and (3) the imposition of discipline commensurate with the misconduct—punishment. *See Hardy*, 21-0715, p. 3, 342 So.3d at 1079.

The CSC's final decision is "subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located." LA. CONST., ART X, §12(A). An appeal from a final decision of the CSC, thus, is to this court. When a CSC decision is appealed to this court, the applicable standard of review is as follows:

- Appellate courts review civil service cases applying a mixed standard of review, depending on the nature of the issue being addressed. *Pitre v. Dep't of Fire*, 21-0632, p. 7 (La. App. 4 Cir. 4/20/22), 338 So.3d 70, 75 (citing *Russell v. Mosquito Control Bd.*, 06-0346, pp. 7-8 (La. App. 4 Cir. 9/27/06), 941 So.2d 634, 639-40).

7

- On factual issues, deference should be given to the CSC's factual conclusions. "A reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review." *Mathieu v. New Orleans Pub. Library*, 09-2746, p. 5 (La. 10/19/10), 50 So.3d 1259, 1262 (citation omitted).

- On legal issues, an appellate court in CSC cases applies a *de novo* standard of review. "When the civil service board has committed a reversible legal error, the reviewing court should make its own *de novo* review of the record and render a judgment on the merits, if possible. A legal error occurs when the lower court applies incorrect principles of law and such errors are prejudicial." *Voltolina v. City of Kenner*, 20-151, pp. 4-5 (La. App. 5 Cir. 12/2/20), 306 So.3d 640, 644 (internal citations omitted).[8]

- On mixed factual and legal issue, the manifest error standard of review applies. In CSC cases, as in other civil cases, mixed questions of law and fact are reviewed under the manifest error standard. *Russell*, 06-0346, p. 8, 941 So.2d at 640 (observing that "a mixed question of fact and law should be accorded great deference by appellate courts under the manifest error standard of review") (citation omitted).[9]

- "Then, the court must evaluate the commission's imposition of a particular disciplinary action to determine if it is both based on legal cause and is commensurate with the infraction; the court should not modify the commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion. 'Arbitrary or capricious' means the absence of a rational basis for the action taken; 'abuse of discretion' generally results from a conclusion reached capriciously or in an arbitrary manner." *Mathieu*, 09-2746, pp. 5-6, 50 So.3d at 1262-63 (internal citations omitted).

## DISCUSSION

Ms. Morales assigns the following four errors to the CSC's decision: (i) the CSC ignored evidence and facts that were contrary to its decision; (ii) the OIG did not follow its policy when investigating and terminating Ms. Morales; (iii) Ms.

---

[8] *See also Walters,* 454 So.2d at 113 (observing that "[i]n reviewing the commission's procedural decisions and interpretations of law the court performs its traditional plenary functions of insuring procedural rectitude and reviewing questions of law").

[9] *See also Perry v. Dep't of Law*, 17-0609, p. 4 (La. App. 4 Cir. 1/31/18), 238 So.3d 592, 596 (observing that "[s]ince this matter involves the Civil Service Commission and is one regarding findings of law and fact, we will review this matter under a manifest error/clearly erroneous standard of review"); *Shannon v. Dep't of Police*, 18-0145, p. 5 (La. App. 4 Cir. 9/19/18), 255 So.3d 1251, 1254 (observing that "a mixed question of fact and law should be accorded great deference by appellate courts under the manifest error standard of review").

Jones lied about how she discovered the missing iPhone due to personal enmity toward Ms. Morales; and (iv) the OIG violated Ms. Morales' Due Process rights when it terminated her. We separately address each assignment of error.

## I. The CSC's Consideration of the Evidence

Ms. Morales advances two species of argument in support of her first assignment of error. First, she relies on perceived inconsistencies or errors in the CSC's decision as evidence that the CSC failed to carefully review the record and ignored evidence favorable to her. Second, Ms. Morales points to testimony and evidence that, she contends, demonstrated she had approval to give away the OIG iPhone and exhibited candor throughout the investigation. Ms. Morales argues that the CSC ignored this evidence in its decision. We address each argument in turn.

In support of her first contention, Ms. Morales points out that the CSC's decision misstated the dates of her hearing, evincing the CSC's failure to carefully review the record. Ms. Morales, however, concedes that the dates of the hearing are immaterial. Next, Ms. Morales urges that the CSC failed to consider Inspector General Michel's testimony that he decided to terminate Ms. Morales, "because she stole an iPhone, gave it to a private citizen, and then lied about it." According to Ms. Morales, the OIG did not allege theft until the hearing and provided no evidence to support the allegation. Thus, Ms. Morales maintains, the CSC erred in relying on Mr. Michel's purported basis for termination when the OIG produced no evidence of theft.

We do not find Ms. Morales' argument persuasive. The CSC's error concerning the dates of Ms. Morales' hearing is immaterial and does not undermine the CSC's factual or legal findings. Moreover, from the outset of the OIG's investigation and disciplinary proceedings against Ms. Morales, it was made

9

clear to Ms. Morales that the OIG suspected she gave away property owned by the OIG to a private individual without authorization. While the OIG may not have used the word "theft" to characterize Ms. Morales' action, it was not unreasonable for Mr. Michel to describe it as such during the hearing.[10] And as the CSC's decision made clear, Ms. Morales' attempted cover-up of her unauthorized action was of greater significance than the wrongful conduct itself, and her lack of candor alone justified her termination.

Ms. Morales next claims that the CSC's decision ignored evidence favorable to her. She contends that a thorough review of all the evidence demonstrates that the OIG failed to meet its burden of proving that Ms. Morales gave the iPhone away without approval or that Ms. Morales lacked candor during the OIG's investigation. We find, however, that the opposite is true. In her attempt to demonstrate the CSC's alleged error, Ms. Morales relies on a narrow reading of selected testimony while ignoring the ample testimony supporting the CSC's decision.

There is no dispute that Ms. Morales gave away OIG property to a private individual, in violation of city policies. And though Ms. Morales paints her former supervisor, Mr. Schwartz's inability to recall whether he authorized the donation as evidence that she may have had authorization, the relevant witnesses, including Mr. Schwartz and Ms. Morales herself, unanimously agreed that a donation of OIG property would have been documented in writing and that a donation to a private individual was prohibited by city policies. Considering the inability of anyone involved in the investigation to find written authorization for the donation, the

_____

[10] *See* La. R.S. 14:67, which provides, in pertinent part: "Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations."

CSC's factual finding that Ms. Morales donated the OIG-owned iPhone to Mr. Fournier without authorization was not clearly wrong.

Moreover, we find Ms. Morales' arguments regarding her purported candor during the investigation unavailing. The record supports the CSC's conclusion that throughout the investigation Ms. Morales offered shifting misrepresentations in an attempt to conceal her violation of OIG policy. Initially, Ms. Morales claimed she was unable to recall whether the iPhone was owned by the OIG or was her personal phone. After investigators confirmed the iPhone was owned by the OIG—and despite Ms. Morales' initial inability to recall if the iPhone was owned by her or the OIG—Ms. Morales pivoted and claimed that she received approval to give the iPhone away from Mr. Schwartz and Mr. Quatrevaux. Mr. Quatrevaux strongly denied this and Mr. Schwartz stated that if he had authorized Ms. Morales to give away an OIG iPhone, he would have documented it in writing. After finding no written authorization for the donation, Ms. Morales claimed for the first time at the CSC hearing that the documentation had been destroyed either purposefully by other OIG employees or by water damage, but she acknowledged these allegations were purely speculative.

Ms. Morales' shifting narrative throughout the proceedings—in concert with the universal agreement among the relevant witnesses that approval to donate the iPhone would have been documented in writing, the absence of any written documentation, and city policies prohibiting donation of the iPhone to a private individual—supports the OIG's finding that Ms. Morales demonstrated a lack of candor during the investigation.

In a similar case, *Boudreaux v. Office of Inspector General*, 13-1366 (La. App. 4 Cir. 3/12/14), 137 So.3d 695, this court upheld the CSC's decision denying

11

an OIG investigator's appeal of her termination for lying about accepting a minor gift (ten pounds of boiled shrimp). In *Boudreaux*, the Inspector General testified that "his employees must possess impeccable standards of honesty and unimpeachable confidentiality" due to the nature of their work and that it was impossible to employ a person who had proven herself dishonest. *Id*, 13-1366, p. 5, 137 So.3d at 698.

In the instant case, the OIG met its burden of proving that Ms. Morales acted with a lack of candor in attempting to conceal her wrongful act. Further, we find that the OIG met its burden of proving that Ms. Morales' wrongdoing impaired the efficiency of the OIG and that termination was justified. As the CSC Hearing Examiner observed, "[t]his matter is another example of where the cover-up is worse than the crime. . . . As previously held, complete candor is an essential requirement of the position." In light of Inspector General Michel's testimony regarding the paramount importance of honesty by OIG investigators, we find no error in the CSC's finding that Ms. Morales' actions impaired the efficiency of the OIG or its finding that termination was justified. Accordingly, we do not find that the CSC's decision was arbitrary, capricious, or an abuse of discretion.

## II.    The OIG's Failure to Follow Its Investigation Policies

In her second assignment of error, Ms. Morales argues that the OIG failed to follow its own investigation policies while investigating Ms. Morales. Ms. Morales details alleged deficiencies in the OIG's investigation, but each alleged flaw stems from her argument that the OIG failed to abide by its own Qualitative Standards Investigations policy. We do not find this argument persuasive.

Both the Inspector General and the OIG Chief of Investigations confirmed in their CSC hearing testimony that the Qualitative Standards Investigations policy

12

does not apply to internal investigations and that the OIG does not have a formal policy for internal investigations. The policy itself makes this apparent, as it is focused on external investigations and contains no provisions addressing internal investigations. Further, OIG Chief Investigator Centola testified that many of the policies the OIG employs for external investigations would be inappropriate for internal personnel investigations.[11] Ms. Morales has cited no authority suggesting that the OIG's Qualitative Standards Investigations policy extends to internal investigations into wrongdoing by its OIG personnel.

Ms. Morales also criticizes Chief Investigator Centola and then-interim Inspector General Michel for failing to notify outgoing Inspector General Darry Harper that they had commenced an investigation into Ms. Morales. But Inspector General Michel testified at the CSC hearing that at the time the investigation began, Mr. Harper was nearly retired—with Mr. Michel already named interim Inspector General—and thus was rarely present at the OIG.

Despite Ms. Morales' critiques of the OIG's investigation, she does not dispute the authenticity of the evidence discovered during the investigation. Moreover, Ms. Morales cites no authority requiring reversal of the CSC's decision due to the alleged flaws in the OIG's investigation. We therefore find Ms. Morales' second assignment of error unpersuasive.

III.   *Bobbie Jones' Enmity Toward Ms. Morales*

In her third assignment of error, Ms. Morales claims that OIG employee Bobbie Jones, whose report initiated the OIG's investigation, had a documented

---

[11] For example, Mr. Centola testified that OIG policies require that memoranda of interviews and witness statements be uploaded to a database accessible to all OIG investigators. He testified that, in internal investigations, it would be inappropriate to allow other employees access to private personnel matters.

hatred of Ms. Morales. Ms. Morales cites the conflicting testimony between Ms. Jones—who testified that Mr. Fournier and Mr. Turner approached Ms. Jones about the iPhone—and Mr. Fournier and Mr. Turner—who denied approaching Ms. Jones—as evidence that Ms. Jones was lying about how she learned Ms. Morales gave away the iPhone. Consequently, Ms. Morales urges, the CSC's failure to consider this conflicting testimony and Ms. Jones' alleged enmity for Ms. Morales demonstrates that she was not given a full and fair hearing, requiring reversal.

But Ms. Morales does not dispute that she gave the iPhone to Mr. Fournier. She also fails to cite any authority requiring reversal of the CSC's decision if Ms. Jones was lying about how she discovered that Ms. Morales gave the iPhone to Mr. Fournier. Thus, how the OIG learned of the wrongful donation is irrelevant.[12] Accordingly, we find Ms. Morales' arguments regarding Bobbie Jones' testimony unpersuasive.

### IV. Ms. Morales' Due Process Rights

In her fourth and final assignment of error, Ms. Morales argues that the OIG's termination of her employment violated her constitutional Due Process rights, because, she alleges, the OIG had already decided to terminate her employment before the pre-termination hearing took place.

The essential elements of due process are notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). "A tenured public employee is entitled to oral or

---

[12] Moreover, contrary to Ms. Morales' claim, the CSC Hearing Examiner did consider the conflict in testimony between Ms. Jones, on one hand, and Mr. Fournier and Mr. Turner, on the other, and even noted the conflict in his report. Ms. Morales suggests that the CSC erred in believing Ms. Jones over Mr. Fournier and Mr. Turner. We disagree. "[W]here two permissible views of the evidence exist, the [CSC's] choice between them cannot be manifestly erroneous or clearly wrong." *Boudreaux*, 13-1366, p. 4, 137 So.3d at 697.

written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story prior to disciplinary action." *Perkins v. Sewerage & Water Bd.*, 95-1031 (La. App. 4 Cir. 2/29/96), 669 So.2d 726, 728 n. 3. "Due process is a flexible standard which requires such procedural safeguards as a particular situation demands. Since due process is not a technical concept with a fixed content unrelated to time, place and circumstances, precisely what process is due in a given case is dependent upon the peculiar facts involved." *Brown v. Hous. Auth. of New Orleans*, 590 So.2d 1258, 1260 (La. App. 1st Cir. 1991) (internal citations omitted). This Court has held that an employee is entitled to advance notice of the charges before the pre-termination hearing; and such notice "should fully describe the conduct complained of, setting forth the relevant dates and places and the names of witnesses against the employee to enable the employee to fully answer and prepare a defense." *Williams v. Dept. of Property Management.,* 02-1407, p. 3 (La. App. 4 Cir. 4/16/03), 846 So.2d 102, 104.

Based on our review of the OIG's disciplinary and termination proceedings, we find no violation of Ms. Morales' Due Process rights. Ms. Morales was informed in great detail of the charges against her by way of Inspector General Michel's eleven-page December 15, 2020 letter. This letter also notified Ms. Morales of her pre-termination hearing, her right to have counsel at her pre-termination hearing, and her right to submit evidence in her favor at the pre-termination hearing. Ms. Morales was given more than three weeks to prepare for the pre-termination hearing but failed to submit evidence corroborating her claim that she had approval to give away the OIG iPhone. Her inability to produce corroborating evidence further buttressed the OIG's charge that she lacked candor

15

when responding to the OIG's investigation. Moreover, Ms. Morales was afforded a three-day hearing in her appeal to the CSC, she was given the opportunity to subpoena documents before the hearing, she was permitted to testify at the hearing, and she was permitted to question nine witnesses at the hearing. During the CSC hearing, Ms. Morales again failed to submit evidence corroborating her claim that she had approval to give away the OIG iPhone, nor did she offer persuasive evidence demonstrating her candor during the OIG's investigation.

In *Honore' v. Department of Public Works*, 14-0986 (La. App. 4 Cir. 10/29/15), 178 So.3d 1120, this court found no violation of a terminated employee's Due Process rights when the employee was provided with a detailed synopsis of the charges against her; she was given an opportunity to respond at a pre-termination hearing; and she was given notice of her right to appeal her termination. Likewise, we find Ms. Morales was given sufficient notice and an opportunity to respond. Accordingly, we find no indication that Ms. Morales' Due Process rights were violated.

**THE OIG'S REQUEST FOR ATTORNEY'S FEES AND COSTS**

In its appellee brief, the OIG requests frivolous appeal damages. *See* La. C.C.P. art. 2164. But the proper procedure for an appellee to request frivolous appeal damages is to file either an answer to the appeal or a cross-appeal. *An Erny Girl, L.L.C. v. BCNO 4 L.L.C.*, 16-1011, p. 17 (La. App. 4 Cir. 3/30/17), 216 So.3d 833, 844 (internal citations omitted). "[A]n appellee cannot recover damages for taking a frivolous appeal if the damages are first requested in the appellee's brief." *Id.* (quoting Roger A. Stetter, LA. PRAC. CIV. APP. § 11:18 (2016)). Since the OIG failed to assert a frivolous appeal damage claim in either an answer to the appeal or a cross-appeal, we decline to address it. *See Armstrong Airport*

16

*Concessions v. K–Squared Rest., LLC*, 15-0375, pp. 18-19 (La. App. 4 Cir. 10/28/15), 178 So.3d 1094, 1106; *Kirby v. Poydras Ctr., LLC,* 15-0027, 15-391, p. 13 (La. App. 4 Cir. 9/23/15), 176 So.3d 601, 608; *Carroll v. Department of Police*, 06-0726, p. 5 (La. App. 4 Cir. 11/21/06), 946 So.2d 674, 677; *Eckhardt v. Reveley*, 04-0288, pp. 4-5 (La. App. 4 Cir. 7/21/04), 881 So.2d 128, 131.  Accordingly, the OIG's request for frivolous appeal damages is denied.

## **DECREE**

For the foregoing reasons, we affirm the judgment of the Civil Service Commission of the City of New Orleans denying Kristen Morales' appeal of the Office of the Inspector General's suspension and termination of her employment.

**AFFIRMED**